**CENTRAL SOYA COMPANY, INC.,**
Plaintiff-Appellee,

v.

**EPSTEIN FISHERIES, INC.,**
Defendant-Appellant.

No. 81–2494.

United States Court of Appeals,
Seventh Circuit.

Argued April 2, 1982.
Decided April 27, 1982.

Philip C. Jones, Washington, D. C., for defendant-appellant.

William A. Stearns, Quarles & Brady, Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and LEIGHTON,* District Judge.

POSNER, Circuit Judge.

This diversity case involves the branch of contract law known as suretyship. The plaintiff, Central Soya Company, Inc., made a contract to sell catfish feed to Aquarium Farms, Inc., and represented that this would be a "complete feed" which would enable the growing of catfish in an aquarium where there would be no natural food. The catfish so grown were destined for the defendant, Epstein Fisheries, Inc. To facilitate this effort to bypass nature, Epstein Fisheries guaranteed Central Soya payment of up to $20,000 for the catfish feed sold to

* Of the Northern District of Illinois.

Aquarium Farms. The guaranty recited that it was to remain in effect until all indebtedness arising from the purchase of the feed was paid off by Aquarium Farms and that no settlement, compromise, release, modification, or other disposition of any of that indebtedness would impair the guaranty.

Alas, the catfish did not prosper on their novel diet; they were stunted and deformed. Aquarium Farms complained to Central Soya that the feed was defective, and Central Soya gave Aquarium Farms a check for $50,000 not to sue; thus assuaged, Aquarium Farms agreed to keep buying the feed. At the time of this, the first, settlement, Aquarium Farms owed Central Soya $13,000 for feed already delivered; it is unclear whether this debt was forgiven as part of the settlement.

Delivery of the feed resumed but the catfish still would not grow normally; and Aquarium Farms, claiming that this was because the feed was still defective, stopped buying it and refused to pay for what it had already bought. The unpaid balance was either $11,000 or $24,000, depending on whether the previous indebtedness of $13,-000 had been forgiven. Central Soya sued Aquarium Farms for $24,000 and joined Epstein Fisheries, the guarantor, as a codefendant. Aquarium Farms counterclaimed for $65,000 in damages allegedly caused by the defective feed since the first settlement. The dispute between Central Soya and Aquarium Farms was settled before trial by each party dropping its claim against the other. But Epstein Fisheries remained in the case as a defendant and Central Soya, claiming that Aquarium Farms had failed to pay the money it owed for the catfish feed, sought to hold Epstein Fisheries liable under the guaranty for the first $20,000 of Aquarium Farms' indebtedness. The district judge, after a bench trial, found in favor of Central Soya and against Epstein Fisheries, and entered a judgment for $20,-000 (plus interest) from which Epstein Fisheries appeals.

■ Nowhere in the pleadings, briefs (in this court or below), pretrial order, district court's opinion, or any other document in this case is there a statement of what state's law we should be applying in this diversity case. The parties and the district court have treated this as a case governed by general common law, much as if *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), had never been decided. We do not think we could be required by a stipulation of the parties to decide a case according to a body of law that is nowhere in force, and that is what we would be doing if we tried to decide this case under general common law.

■ *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), directs us in a diversity case to apply the conflict of laws rules of the forum state, in this case Wisconsin. *American State Bank v. United States Fidelity & Guar. Co.*, 331 F.2d 479 (7th Cir. 1964), suggests that a Wisconsin court in a suretyship case such as this would apply the law of the state where the obligation being guaranteed was performed. That would be Nebraska, where Aquarium Farms had its catfish-growing operation. More recent authority, however, suggests the need for a more complex analysis, of rather indeterminate outcome. See, e.g., *Lichter v. Fritsch*, 77 Wis.2d 178, 252 N.W.2d 360 (1977). But a shortcut leads us to the conclusion that Wisconsin suretyship law governs here. A Wisconsin (or any) state court trying a case in which, as here, the parties did not explicitly indicate which law they thought governed would naturally apply the law of its own state. This is an implicit rule of Wisconsin conflicts law which *Klaxon* makes binding on a federal court in Wisconsin in a diversity case. We note for future reference that it facilitates appellate review of diversity cases to be told what state's law was applied in the trial court.

■ Central Soya concedes that despite the broad language of the guaranty, if Aquarium Farms had paid in full whatever it owed Central Soya for catfish feed, Central Soya would have no claim against Epstein Fisheries, the guarantor of that indebtedness. The guaranty is against de-

fault, and if there is no default the creditor has no claim against the guarantor; suretyship is not double indemnity. At oral argument Central Soya's counsel further conceded that a payment which discharges the guarantor need not be in cash, but could be in kind. So if Aquarium Farms, in payment of its debt to Central Soya, had given Central Soya a piece of land worth at least $24,000, the debt would be fully satisfied and Epstein Fisheries discharged. See Stearns, The Law of Suretyship 193 (5th ed., Elder, 1951).

■ What Epstein Fisheries claims Aquarium Farms gave Central Soya in payment of its debt was not land but a promise to drop a $65,000 counterclaim. But a promise, too, is a form of payment, and depending on how much it is worth it could fully satisfy a debt. To take an extreme example, if the probability that Aquarium Farms would get a judgment against Central Soya for the full $65,000 had been 100 percent, then an enforceable promise by Aquarium Farms to drop the counterclaim was worth $65,000 to Central Soya, which is a good deal more than Aquarium Farms owed it for the catfish feed. But of course the counterclaim must have been worth less. Otherwise Aquarium Farms would not have agreed to dismiss it in exchange for Central Soya's dismissing a much smaller claim. Aquarium Farms might not have been able to prove liability, or damages as great as $65,000. Suppose that, because of such uncertainties, the expected value of the counterclaim was only $5000; then a promise not to press the counterclaim would not have been full satisfaction of Aquarium Farms' debt to Central Soya.

■ This analysis suggests that the value of the counterclaim is a factual question to be determined at trial, as the Supreme Court of Wisconsin assumed in *Continental Bank & Trust Co. v. Akwa*, 58 Wis.2d 376, 206 N.W.2d 174 (1973). The defendants there had guaranteed Akwa-Downey's indebtedness of some $623,000 to the plaintiff. The plaintiff's action against Akwa-Downey was settled by an agreement whereby Akwa-Downey gave the plaintiff a

check for $559,000 and also released claims against the plaintiff totaling $180,000. The defendant argued that the indebtedness had been fully satisfied, for although the cash payment was less than the total indebtedness the claims that were released were worth more than the difference. The court disagreed: "Whether the claims released by Akwa-Downey in favor of the plaintiff are of sufficient value to make up the apparent deficiency is a matter to be decided upon trial . . . ." 58 Wis.2d at 390, 206 N.W.2d at 182. This is not quite a holding that dropping a counterclaim can discharge a guarantor. The precise issue decided by the Wisconsin court was whether, by mentioning the released claims of $180,000 in his complaint, the plaintiff had admitted full payment of the indebtedness; and the court held he had not, that the value of the claims was a matter to be proved at the trial—they could not be taken at face value. But this implies, and we have no doubt the Wisconsin court would hold in a case where the issue was presented, that the release of a valuable counterclaim can discharge a debt and with it its guarantor.

The Wisconsin court did not explain how the parties should proceed on remand to determine the value of the released claims. On this question the parties to the present case take extreme and, as it seems to us, untenable positions. Central Soya contends that the value of Aquarium Farms' counterclaim was inherently speculative and should therefore be treated as zero. This is not only inconsistent with what is implied in the passage just quoted from the *Akwa* decision but is unrealistic in the circumstances of the present case. Central Soya had recently paid $50,000 to Aquarium Farms on an identical claim. Even if the counterclaim was not worth $65,000, or even $24,000, so long as it was worth anything more than $4000 its abandonment had to reduce Aquarium Farms' net indebtedness to Central Soya below $20,000 and so disentitle Central Soya to recover the full amount of the guaranty from Epstein Fisheries. Furthermore, Central Soya concedes that if Aquarium Farms had a good affirmative defense to its suit for the unpaid debt,

the defense would extinguish the debt and discharge Epstein Fisheries. The defense would of course be that the feed was defective. We cannot see what difference it makes whether an obligor asserts an affirmative defense that if accepted would extinguish the debt or a counterclaim that if successful—even less than fully—would completely offset the debt. In either event the guarantor would be discharged. There is also an intermediate possibility—that the main claim and the counterclaim were each worth very little. Suppose that because the feed was defective, or because Central Soya had previously forgiven a part of the indebtedness on the feed, or for both reasons, Central Soya's claim against Aquarium Farms was worth only $10,000; then even if the counterclaim also was worth only $10,000, its dismissal conferred a benefit on Central Soya equal to the debt that remained unpaid, and discharged that debt in full.

■ But Epstein Fisheries makes the equally untenable argument that the court should not attempt to value the counterclaim at all but should take it at face value. It argues that the fact that Central Soya was willing to drop its claim against Aquarium Farms in exchange for Aquarium Farms' dropping its counterclaim shows that the counterclaim must have been at least as valuable as the main claim, i.e., the debt itself; and hence the debt must have been satisfied in full. But this, the very argument rejected in *Akwa*, assumes the point to be determined—that Central Soya accepted the dismissal of the counterclaim as full satisfaction of the debt. Central Soya may have thought that all it was giving up in the settlement was its claim for $24,000 against Aquarium Farms and that its claim for $20,000 of that amount against Epstein Fisheries remained intact. The guaranty is explicit that the mere release of the obligor is not a defense to liability under the guaranty. Such a release does not satisfy and thereby extinguish the debt but merely reveals the creditor's preference for proceeding against the guarantor rather than the original obligor,

as he has every right under the guaranty to do. See, e.g., *Hickory Springs Mfg. Co. v. Evans*, 541 S.W.2d 97 (Tenn.1976). Since the guaranty was less than Aquarium Farms' debt by $4000, Central Soya might, so long as the guaranty was unaffected, have been willing to release Aquarium Farms if it thought the counterclaim, though meritless, had a nuisance value of $4000. If so, the dismissal of the counterclaim would not extinguish Aquarium Farms' debt and would not discharge Epstein Fisheries from its guaranty.

■ The facts developed below unfortunately do not reveal whether the dismissal of Central Soya's suit against Aquarium Farms in exchange for the dismissal of the counterclaim was a release on the one hand or an accord and satisfaction on the other. This makes it necessary to estimate the value of the counterclaim—more precisely, the value to Central Soya of the counterclaim's being dropped. The practical problem, unilluminated by *Akwa* or any other decision that we have been able to find, is how to do this without trying the case that was settled—without, that is, turning an action on a guaranty into a breach of warranty suit by the original obligor against the plaintiff. Since discharge of the underlying debt is an affirmative defense of the guarantor, and the burden of proof is therefore on him, it is clear that he must present some evidence of the value of the thing that he claims was used to discharge the debt. But we think his initial burden of production is satisfied by submitting a copy of a counterclaim for an amount greater than the debt plus a settlement agreement showing that the counterclaim was dismissed in consideration of the dismissal of the obligee's action for the debt against the obligor. This proof establishes a reasonable probability of at least partial discharge. The burden of production then shifts to the obligee to show that the expected value of the counterclaim—what the counterclaimant realistically could have expected to get from the obligor if the case had gone to trial—was less than the amount of the debt, and if so how much less. The burden of

persuasion of course remains on the guarantor throughout.

If we were to apply this approach to the record developed below, we would have to reverse with instructions to enter judgment for Epstein Fisheries. It satisfied its burden of production by producing a counterclaim which demanded damages greater than the debt and a settlement whereby the counterclaimant agreed to dismiss the counterclaim in exchange for the creditor's agreeing to dismiss his action for the debt. Central Soya produced no evidence that the counterclaim was unlikely to have succeeded or that if it had succeeded Aquarium Farms could not have proved damages substantial enough to eliminate (or at least reduce below the maximum guaranteed) its debt to Central Soya. But the approach that we have adopted in an effort to give some structure to a difficult factual inquiry is new, and we do not think Central Soya should be penalized for having failed to anticipate it.

■ We therefore reverse and remand for a new trial; and to provide additional guidance to the district court on remand we shall resolve two other issues presented by Epstein Fisheries in this appeal. First, it argues that Central Soya failed to make out even a prima facie case that Aquarium Farms owed it money, because Central Soya did not plead or prove that it performed its part of the bargain by selling catfish feed that did what Central Soya had represented it would do. We disagree that this was part of Central Soya's burden of pleading or proof. The feed was accepted by Aquarium Farms, see Wis.Stat. § 402.606; and while Aquarium Farms could still show that Central Soya had breached its contract, thereby excusing Aquarium Farms from having to pay for the feed it had accepted, the burden of proving a breach was on Aquarium Farms. See Wis.Stat. § 402.-607(4); *Prompt Elec. Supply Co. v. Allen-Bradley Co.*, 492 F.Supp. 344, 348 (E.D.N.Y. 1980).

■ Second, Epstein Fisheries argues that it was error for the district court to exclude, under Rule 408 of the Federal Rules of Evidence, the testimony of Larry Haack—an accountant present at the negotiations leading to the first settlement between Central Soya and Aquarium Farms (at which Central Soya paid Aquarium Farms $50,000 and Aquarium Farms agreed to continue buying the catfish feed)—that the parties to the settlement intended to forgive the $13,000 indebtedness of Aquarium Farms to Central Soya for catfish feed already delivered but not paid for. Rule 408 excludes evidence of compromises and offers to compromise, and of "statements made in compromise negotiations." Although this language is broad enough to cover Haack's testimony, the purpose of the rule must be considered. It is to encourage settlements. The fear is that settlement negotiations will be inhibited if the parties know that their statements may later be used as admissions of liability. But Haack's testimony was not offered for the purpose of demonstrating that Central Soya was or was not liable to Aquarium Farms for breach of its contract to supply a complete catfish feed. The purpose was to demonstrate what the terms of the settlement of Aquarium Farms' claim were. "Where the settlement negotiations and terms explain and are a part of another dispute they must often be admitted if the trier is to understand the case." 2 Weinstein & Berger, Weinstein's Evidence ¶ 408[5], at 27 (1981). That is this case.

Haack's testimony was not only proper under Rule 408; it was highly germane to the question of Epstein Fisheries' liability to Central Soya on the guaranty. If Haack's testimony was believed, it would follow that although Central Soya sued Aquarium Farms for $24,000 it could not have collected more than $11,000, because that was Aquarium Farms' total unpaid indebtedness. If so, then even if the counterclaim was totally worthless, the most Central Soya would be entitled to collect in this suit on the guaranty would be $11,000 —not $20,000, as the court below thought. In addition, if the debt was only $11,000, it would be completely offset by a counterclaim having an expected value of $11,000,

making it more likely that the dropping of the counterclaim operated to discharge the debt—and Epstein Fisheries, the guarantor—in full.

REVERSED AND REMANDED FOR NEW TRIAL.