**WINCHESTER PACKAGING, INCORPORATED, Plaintiff–Appellee,**

v.

**MOBIL CHEMICAL COMPANY, Defendant–Appellant.**

No. 91–3911.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1993.

Decided Jan. 18, 1994.

Gomer W. Walters (argued), John W. Hofeldt, J. Ray Wood, Wood, Phillips, Mason, Recktenwald & Vansanten, Chicago, IL, Robert C. Walbaum, Springfield, IL, for Winchester Packaging, Inc.

Forrest G. Keaton, Rammelkamp, Bradney, Dahman, Kuster, Keaton & Fritsche, Jacksonville, IL (argued), for Mobil Chemical Co.

Before POSNER, Chief Judge, KANNE, Circuit Judge, and REINHARD, District Judge.*

POSNER, Chief Judge.

Mobil Chemical Company, the defendant in a diversity breach of contract suit brought by Winchester Packaging, Inc., appeals from a judgment for the plaintiff of more than half a million dollars, arguing that it was entitled to judgment notwithstanding the verdict, or alternatively to a new trial.

Mobil owned a business that manufactured a plastic wrapping "paper" for gifts. The last stage in producing "gift wrap" is called "rewinding," and consists of transferring the gift wrap from the very large rolls on which it is initially wound to the much smaller rolls on which it is sold to the consumer. Mobil

---

* Hon. Philip G. Reinhard of the Northern District of Illinois.

contracted out the rewinding stage to Winchester, a small manufacturer of plastic bags. Winchester had done no rewinding previously but was experienced in working with plastic. In order to do the work called for by the contract, Winchester had to purchase a "winding line," which it did with the aid of a $300,000 loan from a local bank. According to testimony that the jury was entitled to believe, Mobil assured both Winchester and the bank that if Mobil got out of the gift wrap business it would buy back the equipment that Winchester had purchased with the loan. This was in 1987. By 1989, Winchester had borrowed a total of $800,000 with which to buy equipment for rewinding gift wrap for Mobil.

In March 1989 Mobil entered into a three-year contract with Winchester for the continued purchase of rewinding services. The contract authorized Mobil to terminate the contract before the three years were up but in the event of early termination Mobil was to reimburse Winchester "for any inventory acquired or contractual commitments made for the purpose of performing Rewinding services on behalf of [Mobil], to the extent that such termination makes them no longer reasonably necessary in [Winchester's] performance of its remaining operations," and to pay Winchester a termination fee of $175,000, which the parties agreed the following month to raise to $250,000.

Five months after signing this contract Mobil sold its gift-wrap business because of disappointing sales and terminated the contract. But it made no payments to Winchester, which in January 1990 wrote in some exasperation to Mobil that it had not been able to replace the lost Mobil business (later it did obtain some replacement business, but not enough to utilize all the winding lines that it had bought to service the contract with Mobil) and warning that "in view of our current position, and since there appears to be a reluctance on Mobil's part to get on with the settlement of the details of stopping production and the terms of the contract, I have engaged the services of John Hofeldt and Gomer Walters of Haight & Hofeldt, Attorneys at Law, in Chicago, Illinois. I would prefer to get this resolved, as I am sure you

would, without getting the lawyers involved." Mobil replied that it had been waiting for Winchester to submit a settlement statement, that is, a bill. Winchester responded in a long letter that ended by saying: "our losses are great enough that I don't want to incur any additional legal costs. I hope that we will be able to come up with a settlement that the attorneys can put their stamp of approval [on]." This was followed up by a memo entitled "Contract Settlement" that listed "the points that need agreement in order to close out our contract." The sum total of the "points" came to only $302,000 even though one of the items was the $250,000 agreed termination fee, yet at trial the largest item of damages sought was for the unpaid balance (almost $800,000) of the bank loans that Winchester had taken out to buy winding lines.

In support of the claim to the unpaid balance of the loans, Winchester argued that its promises (embodied in promissory notes made out to the bank) to repay the loans were comprehended by the contractual term "contractual commitments made for the purpose of performing Rewinding services on [Mobil's] behalf." Ruling that the contract was ambiguous on this question, the judge allowed oral testimony to be presented. Mobil's man on the contract, Karr, testifying about the content of telephone conversations between himself and Winchester's principal, Franseen, said that the $250,000 termination fee had been intended to cover Winchester's major losses from any sudden cessation of the business and that "contractual commitments" was merely a reference to a commitment Winchester had made to buy "shrink film" for packaging the rewound gift wrap. Mobil argues that the jury should have accepted Karr's testimony because it was unrebutted and because it would be absurd to suppose that Mobil had issued Winchester a blank check to buy equipment on credit at Mobil's expense and keep the equipment after the contract was terminated. Mobil further argues that the judge should have allowed into evidence the correspondence (from which we quoted earlier) between Franseen and Karr, because nowhere in it had Franseen demanded that Mobil pay Winchester's promissory notes to the bank. The

judge excluded this correspondence under Fed.R.Evid. 408, which renders evidence regarding settlement offers and settlement negotiations inadmissible, save for special purposes not involved here.

█ We are baffled by Mobil's repeated references to the "unrebutted testimony" of Karr. It is true that Franseen did not testify to a positive recollection contrary to Karr's of every detail of their conversations to which Karr testified. But Franseen denied the most important details, in particular that the term "contractual commitments" had been intended to cover only the shrink film; and Franseen's denials were corroborated by the testimony, self-serving but not on that account unworthy of belief as a matter of law, of the bank's president. Mobil is asking us in effect to rule that Karr was a more credible witness, but we have no power to resolve issues of credibility unless a witness's testimony is "seriously inconsistent internally, or contrary to established laws of nature or otherwise fantastic, or irreconcilably in conflict with indubitable documentary or physical evidence, stipulations of fact, admissions, or evidence of equivalent certainty." *Bullard v. Sercon Corp.*, 846 F.2d 463, 466 (7th Cir.1988). See also *Ondato v. Standard Oil Co.*, 210 F.2d 233, 236 (2d Cir.1954) (L. Hand, J.). In the spirit of this formulation Mobil argues that it would have been *crazy* for it to agree to pay Winchester's promissory notes in an unlimited amount, especially when it had agreed to pay a generous, albeit fixed, termination fee. But the contract need not be interpreted as imputing to Mobil so implausible a promise in order for Winchester to win. The loans must be "for the purpose of performing Rewinding services on behalf of" Mobil, and read in light of the principles of good faith and reasonableness that inform all contractual undertakings unless the parties provide to the contrary this language limited Winchester to borrowing such money as it sincerely and reasonably believed necessary to perform its side of the contract with Mobil. What is more, the words that follow—"to the extent that such termination makes them no longer reasonably necessary in [Winchester's] performance of its remaining operations"—limited Mobil's obligation to that portion of any commit-

ments the value of which to Winchester was eradicated by Mobil's terminating the contract prematurely. If Winchester could use the equipment that it had bought with borrowed money to perform the Mobil contract in its other business, Mobil was off the hook; and in fact the jury awarded Winchester less than half the balance outstanding on the bank loans. Winchester and its bank were small businesses at risk of being left holding a very large bag if Mobil abruptly withdrew from the gift-wrap business, as it did; and it is not unreasonable to suppose that they contracted for a generous measure of compensation should that eventuality occur.

█ The meaning that the jury assigned to the contractual phrase "contractual commitments" was consistent with the contractual language, supported by testimony that it was the jury's responsibility to evaluate, and consistent with business reality. That meaning may, we recognize, just have been an afterthought on the part of Winchester, for the correspondence between Franseen and Karr which Mobil was desperate to put before the jury contains no reference to the unpaid promissory notes. But we do not think the district judge exceeded permissible bounds in excluding the correspondence, although the question is so close that had the judge admitted it we would uphold that ruling as readily.

█ Two senses of "settlement" must be kept distinct. To settle a bill is to pay it. But a bill that itemizes what the sender thinks the recipient owes him and demands—even under threat of legal action—payment is not an offer in settlement or a document in settlement negotiations and hence is not excludable by force of Rule 408. *Perzinski v. Chevron Chemical Co.*, 503 F.2d 654, 657–58 (7th Cir.1974); *United States for Use of D'Agostino Excavators, Inc. v. Heyward–Robinson Co.*, 430 F.2d 1077, 1083 (2d Cir. 1970); *J. & B. Motors, Inc. v. Margolis,* 75 Ariz. 392, 394, 257 P.2d 588, 590 (1953); *Gallagher v. Viking Supply Corp.*, 3 Ariz. App. 55, 411 P.2d 814, 819 (1966). Dunning a deadbeat by threatening to sue is not the same thing as making an offer or demand in

the context of a settlement negotiation. Likewise a statement of a condemnor as to what just compensation is due the condemnee is different from an offer for the purchase of the condemnee's property. *United States v. 320.0 Acres of Land,* 605 F.2d 762, 804–05 (5th Cir.1979). All but the last of these cases predate the Federal Rules of Evidence but the common law principle that they expound is, so far as bears on this case at any rate, carried forward by the rules. The settlement of legal disputes out of court would be discouraged if settlement offers and other documents in settlement negotiations were admissible in evidence. *Central Soya Co. v. Epstein Fisheries, Inc.,* 676 F.2d 939, 944 (7th Cir.1982); Notes of Advisory Committee on 1972 Proposed Rules, Rule 408. For although parties typically are willing to settle for less than they would demand at trial, in order to avoid the expenses and uncertainty of a full-blown litigation, this strategy might be difficult to make credible to a jury, which might treat the settlement offer as the party's highest true estimate of its damage. That at least is the theory of the rule. It may well underestimate the intelligence of the average jury. On the other hand, if it is widely believed it could deter settlement negotiations even if the fear of what a jury would make of the demands and offers made in such negotiations is groundless. And there are below-average juries.

It is far from clear, however, that any of Franseen's letters to Karr contain a settlement offer in the sense of an offer lower than the offeror could reasonably hope to obtain at trial if he were prepared to shoulder the risk and expense of a trial. Were it not for the reference to lawyers, the letters, especially the one that specified an amount claimed to be owed to Winchester by Mobil, would be little if anything more than bills; and as we said earlier a bill is not a settlement offer, and it does not become one merely because the billing party threatens suit if the bill isn't paid.

Although a reference to lawyers is not decisive on the issue of characterization, we know that in this case the reference was not merely a sign of impatience or the making

explicit of what is after all implicit in every bill for a substantial amount of money. Winchester had already engaged lawyers, and from this plus Mobil's own evidence that there were telephone conversations following the initial, unanswered letters from Winchester to Mobil we can infer that Franseen envisaged a substantial likelihood of legal action when he sent the first letter from which we quoted. It is speculative but not implausible that in that and successive letters he was groping for a sum to charge Mobil that would be low enough to induce Mobil to pay rather than fight; so viewed, the letters were indeed settlement offers and not merely computations of the bill owed by Mobil. Mobil is not your average deadbeat. The contract fixed a termination fee but the fixed fee was only a part of the moneys to which the contract entitled Winchester upon termination in fewer than three years. The total amount to which Winchester was entitled was unspecified and highly contestable, and it would make sense for Winchester in submitting a bill to Mobil in an atmosphere in which the threat of a lawsuit was looming to offer an inducement that would avoid the necessity of "incur[ring] any additional legal costs." If this is a correct interpretation of the correspondence, it would run contrary to the letter and spirit of Rule 408 to penalize Winchester for the inducement by allowing Mobil to treat it as an admission that Winchester was owed no more. It may not be a correct interpretation, but we cannot say that the judge abused his discretion in adopting it and excluding the correspondence.

■ Mobil cites *Hiram Ricker & Sons v. Students International Meditation Society,* 501 F.2d 550, 553 (1st Cir.1974), for the proposition that unqualified factual statements made in the course of settlement negotiations, such as, "You owe me $X," as distinct from hypothetical or conditional statements ("I will drop my suit if you pay me $X"), are excepted from the rule barring evidence of settlement negotiations. This much-criticized exception (see, e.g., 2 *McCormick on Evidence* § 266, pp. 195–96 (4th ed. 1992)), which was in decline when Rule 408 was promulgated (after *Ricker*), does not appear in the rule, and the Notes of the Advisory Committee make clear that the

omission was intentional. A bill is, of course, more likely to contain unconditional factual statements than an offer to settle a dispute; so there is an overlap between the old exception for factual statements and the unimpaired distinction between bills and offers. But we cannot see what separate office the old exception performs; it merely inhibits settlement negotiations by forcing the parties to couch all their statements in hypothetical or conditional form.

Mobil was permitted by this court, in retrospect unwisely, to file an oversized brief, in which it presses upon us a number of issues that, because they have considerably less merit than those we have discussed, do not warrant discussion. There is naturally a concern in a case such as this, in which a small local firm is pitted against a giant out-of-state firm, that the giant won't get a fair shake from the jury. But as we can find no reversible error, the judgment is

AFFIRMED.