203 F.3d 477 (7th Cir. 2000)
 BANKCARD AMERICA, INC., Plaintiff-Appellee/Cross-Appellant,
v.
UNIVERSAL BANCARD SYSTEMS, INC., Defendant-Appellant/Cross-Appellee,
and
SAMUEL BUCHBINDER and PAUL ALPERSTEIN, Counter-Defendants/Appellees.
 Nos. 98-2528, 98-2529, and 98-2530
 In the United States Court of Appeals For the Seventh Circuit
 ARGUED September 29, 1999
DECIDED February 1, 2000
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 93 C 1969--Richard A. Posner, Chief Circuit Judge Sitting by Special Designation. [Copyrighted Material Omitted]
 Before HARLINGTON WOOD, JR., MANION, and EVANS, Circuit Judges.
 EVANS, Circuit Judge.
 
 
 1
 Football fans know the sickening feeling: your team scores a big touchdown but then a penalty flag is tossed, wiping out the play. Universal Bancard Systems, Inc. knows that feeling firsthand after seeing not one, but two big touchdowns called back. The referee who waved off the first--a $7.8 million verdict--and then the second--a $4.1 million jury verdict after a second trial--was the Honorable Richard A. Posner, the circuit's chief judge who in this case was wearing, by designation, the robe of a district judge.[1] Like the instant replay official, we now review the decisions of our colleague-- using the voluminous record rather than a television monitor and recognizing that our review in 1999 of a case that began in 1993 is a far cry from instant.
 
 
 2
 It's obvious that Universal Bancard Systems, Inc. fared wonderfully in this litigation with juries, but terribly with Judge Posner. At the first trial, in 1996, a jury found that Bankcard America, Inc. breached its contract with Universal and that Bankcard founders Samuel Buchbinder and Paul Alperstein violated RICO, the Racketeering Influenced and Corrupt Organizations Act. The jury awarded Universal $1,115,000 for the breach of contract and $1,115,000 for each of the two RICO claims. The RICO damages were trebled, bringing Universal's total award to $7.8 million. When District Judge Brian Barnett Duff, who presided over the first trial, moved to senior status, the case was reassigned to Judge Posner under Local Rule 2.30(e). Citing errors at the first trial, Judge Posner threw out the verdict and ordered a new trial, at which he presided.
 
 
 3
 At the second trial, in 1998, the jury found in favor of Buchbinder and Alperstein on the RICO claims, but again concluded that Bankcard breached the contract, this time awarding Universal $4.1 million on that claim. But Judge Posner got rid of that verdict, too, entering judgment for Bankcard because the evidence of damages was insufficient. That left Universal, after nearly a decade of litigation, with nary a penny, an outcome they appeal.
 
 
 4
 Though the average consumer is oblivious to such arrangements, a customer who slaps down her credit card to make a purchase triggers a chain of financial transactions. The merchant usually keeps about 98 percent of the total, with the remaining 2 percent divided between the credit card company (such as MasterCard ), the cardholder's bank (the friendly folks who fill your mailbox every day with credit card offers), and the merchant's bank that processes credit card transactions. Credit card processing banks generally contract with independent sales organizations (ISOs), who sign up merchants on behalf of the bank and provide the merchant with the necessary equipment (such as the nifty little machine through which credit cards are swiped). Big ISOs, in turn, often contract with sub-ISOs to do some of this same work of signing up merchants and servicing the accounts. Once the merchant's credit card processing bank gets its share, it pays the ISO its cut, and the ISO then pays the sub-ISO its portion (the "residuals").
 
 
 5
 At least that's the way it's supposed to work. Things never are quite so tidy in real life, of course, and in this case a contract signed in late 1991 by ISO Bankcard and sub-ISO Universal already had come asunder by early 1993. Bankcard went to court first, suing Universal for breach of contract. Bankcard accused Universal of providing inadequate customer service to the merchants and of converting accounts Universal originally had signed up with Bankcard to United Jersey Bank, another ISO with whom Universal signed a more favorable deal shortly after Universal had entered into the contract with Bankcard. (As a sub-ISO to Bankcard, Universal was not forbidden from signing up merchants with other ISOs, but Universal was not supposed to steer away accounts it already had placed with Bankcard.)
 
 
 6
 Universal counterclaimed against Bankcard for breach of contract and RICO violations. Universal said Bankcard held up merchant applications and delayed and shortchanged Universal on the residuals it was due. In Universal's view, Bankcard drove Universal out of business by cutting off the flow of money and then turned a profit by selling the accounts Universal originally had harvested. The RICO claims were based on the allegation that Bankcard had crushed other sub-ISOs through the same calculated tactics.
 
 
 7
 To be sure, the first trial was not an example of the American judicial system at its finest. The lawyers' questions to witnesses often were lengthy, incoherent, leading, and sounded more like testimony than inquiry. The presentation of the facts was jumbled. Objections and sidebars almost constantly interrupted the proceedings, leaving the jury cooling its heels on the sidelines while the attorneys and Judge Duff quibbled, usually about issues that should have been resolved long before. The admission of exhibits was handled carelessly. Despite all the rough edges, however, having a jury of ordinary folk listen and watch while lawyers question witnesses, introduce documents, and present arguments is, for better or worse, how this country resolves business disputes like this one that the parties cannot solve themselves. In the end, the jury slogged through it all and returned a favorable verdict for Universal. The trial was far from perfect, but imperfection is not what triggers a new trial. A new trial is granted if the verdict is against the manifest weight of the evidence or if a prejudicial error occurred. Even if errorsoccurred, no new trial is required if the errors were harmless. Romero v. Cincinnati Inc., 171 F.3d 1091, 1096 (7th Cir. 1999).
 
 
 8
 Usually we review a district court's grant of a motion for a new trial for abuse of discretion. McClain v. Owens-Corning Fiberglas Corp., 139 F.3d 1124, 1126 (7th Cir. 1998).[2] Customarily, however, this issue arises when the same judge who presided over a trial orders a new trial after determining that the evidence was insufficient to support the jury's verdict. In this case, by contrast, the district judge who presided over the trial was replaced by an appellate judge, sitting by special designation in the district court, who reviewed the cold record and ordered a new trial because he thought the original trial judge erred in admitting evidence and instructing the jury.
 
 
 9
 On appeal, we give plenary review to a district court's interpretations of law, but we generally give deference to a district court's assessment of facts. But that neat capsulization of the standard of review is not a good fit in this case. Because Judge Posner did not preside over the first trial, he enjoyed no special advantage in determining credibility and gauging the evidence--he read the record, just as we have now done. "The problem of the successor judge . . . is that one person hears the testimony and another person makes the factual findings without having seen or heard the witnesses . . . . Deference to such findings, by a district court or an appellate court, would be misplaced in such a case." Henry A. Knott Co. v. Chesapeake and Potomac Tel. Co., 772 F.2d 78, 85 (4th Cir. 1985). See also Youakim v. McDonald, 71 F.3d 1274, 1282 (7th Cir. 1995); Schering Corp. v. Illinois Antibiotics Co., 62 F.3d 903, 908 (7th Cir. 1995). But see United States v. Soto, 48 F.3d 1415, 1420-21 (7th Cir. 1995); Langevine v. District of Columbia, 106 F.3d 1018, 1023 (D.C. Cir. 1997); Amarel v. Connell, 102 F.3d 1494, 1515 (9th Cir. 1996). As we see it, to the extent Judge Posner's order of a new trial was based on the law, we review it de novo; to the extent the order was based on the facts, deference is not warranted because of the unique circumstances of this case.
 
 
 10
 Though Judge Posner said there were additional errors at the first trial, he identified three in ordering a new trial: transmitting to the jury exhibits that had not been admitted into evidence; improper receipt of testimony about settlement talks; and faulty instructions to the jury on the RICO claim. Universal challenges all of these reasons on appeal.
 
 
 11
 Of the 43 exhibits that went to the jury room at the close of the trial, 24 had not been admitted into evidence during the trial. At the time Judge Duff decided which exhibits to send to the jury, however, Bankcard objected to only four exhibits. Judge Duff overruled Bankcard's objections after being told by Universal's counsel that the four exhibits were admitted. Actually, one of the exhibits to which Bankcard objected had been admitted into evidence, but the other three had not.
 
 
 12
 Bankcard waived its objection to 21 of the 24 exhibits by failing to object at the time Judge Duff was making his decision--the time when the problem could have been avoided. Bankcard wails that the trial transcript was not available at the time and that Universal's counsel erroneously assured and reassured Bankcard andJudge Duff that all 43 of the exhibits had been admitted at trial. The inaccurate statements by Universal's counsel, however, although typical of the slipshod work in this case, do not excuse Bankcard's sleeping at the switch. Judge Duff conferred with the lawyers about what exhibits should be transmitted to the jury on the morning after testimony in the 2-week trial concluded. Trial transcripts generally are not instantly available and their absence does not excuse Bankcard's failure to keep track of what was going on at the trial. Bankcard was silent when it mattered and now says, "Gee, we finally got around to checking the trial transcripts and it turns out the jury received some stuff it shouldn't have, so let's have a whole new trial and negate the 2 weeks of time that the judge, clerk, court reporter, bailiffs, jurors, witnesses, attorneys, and parties spent on the first trial." The point of the waiver rule is to raise objections and provide the trial judge with information before a mistake has occurred. Without this rule, litigants would sit on their hands, wait to see the result of the litigation, and then if the outcome is unfavorable come back and complain about a problem that could have been avoided.
 
 
 13
 Our review of the exhibits that passed to the jury without objection is confined to a glance for plain error, a review of only limited expanse. Wilson v. Williams, 161 F.3d 1078, 1090 (7th Cir. 1998); Karazanos v. Madison Two Assoc., 147 F.3d 624, 629 (7th Cir. 1998); Stringel v. Methodist Hosp. of Indiana, Inc., 89 F.3d 415, 421 (7th Cir. 1996); Maul v. Constan, 928 F.2d 784, 787 (7th Cir. 1991); Kendra Oil & Gas, Inc. v. Homco, Ltd., 879 F.2d 240, 243 (7th Cir. 1989); Deppe v. Tripp, 863 F.2d 1356, 1360-61 (7th Cir. 1988). To prevail under the plain error doctrine, the party that waived the issue in the trial court must show that exceptional circumstances exist, substantial rights will be affected, and a miscarriage of justice will result. Wilson, 161 F.3d at 1090. In this case there was no demonstration of exceptional circumstances or of a miscarriage of justice. The 21 exhibits that should not have gone to the jury, but to which Bankcard failed to make a timely objection, consisted mostly of innocuous letters, boilerplate contract language, meaningless fax cover sheets, and pages of cryptic business records.
 
 
 14
 The only documents that might have placed Bankcard in a bad light were a letter accusing Bankcard's personnel of being rude and sometimes threatening and letters haggling over whether Bankcard was paying Universal the proper amount of residuals, whether Bankcard was wrongfully charging merchants an annual $25 fee, and whether Universal was supposed to be providing service to certain merchants. All of these documents were cumulative of testimony given during the trial and of other documents that were properly admitted into evidence and transmitted to the jury. In addition, though none of these 21 documents actually were admitted into evidence, none of them ever were ruled inadmissible either, and all of them probably would have been admitted upon request. Cf. Carson v. Polley, 689 F.2d 562, 571 (5th Cir. 1982) (trial court properly ordered new trial after jury received exhibits that had been ruled inadmissible). Though submitting these exhibits to the jury was a mistake, it was not plain or prejudicial error that warranted a new trial.
 
 
 15
 Bankcard preserved its objection to three documents that were not admitted into evidence but were provided to the jury. One letter, from Universal senior vice-president Paul E. Albert to Bankcard's Buchbinder, said the two parties had agreed merchants should not have to pay Bankcard an annual $25 fee. Another letter from Albert to Buchbinder complained that Bankcard was failing to deposit certain merchant funds quickly enough and demanded that Bankcard retract a "warning" to Universal. The third letter, from Bankcard's Alperstein to Universal's Albert, apologized for a delay inpaying residuals and blamed the delay on the processing bank's tardiness in providing that month's information to Bankcard. All of these documents would have been admissible upon request and duplicated extensive trial testimony in which various witnesses complained about how Universal was treated by Bankcard. Bankcard protests that it never had a chance to explain these exhibits, but its side of the story on these issues was thoroughly presented at trial. When unapproved material reaches the jury, the trial court must decide whether there is a reasonable possibility the material altered the jury's verdict. Artis v. Hitachi Zosen Clearing, Inc., 967 F.2d 1132, 1143 (7th Cir. 1992). Though turning these documents over to the jury was sloppy, the mistake was harmless and did not, in our view, merit the ordering of a new trial.
 
 
 16
 The next issue involves Rule 408 of the Federal Rules of Evidence, which forbids the admission of statements made during settlement negotiations to prove liability or the lack of liability. The rule does not require exclusion when the evidence is offered for another purpose, such as proving the bias or prejudice of a witness. Because settlement talks might be chilled if such discussions could later be used as admissions of liability at trial, the rule's purpose is to encourage settlements. See Winchester Packaging, Inc. v. Mobil Chem. Co., 14 F.3d 316, 320 (7th Cir. 1994); Central Soya Co. v. Epstein Fisheries, Inc., 676 F.2d 939, 944 (7th Cir. 1982).
 
 
 17
 Under the Bankcard-Universal contract, for one year after the termination of the contract Universal was forbidden to steer merchants it had signed up to Bankcard competitors. Bankcard terminated the contract in March 1993. In the next few months Universal rolled over a number of accounts to United Jersey Bank, one of Bankcard's competitors with whom Universal also had a contract. Bankcard claimed that Universal thereby breached the contract and that Universal should not be allowed to recover on its breach of contract counterclaim because it had failed to comply with all material terms of the contract. Universal, however, said that it rolled over the accounts at a time when it thought it had reached a settlement with Bankcard that allowed the rollovers. Of course, no settlement was ever made final or this case would not be before us. Judge Duff initially thought Rule 408 should bar evidence that Universal thought it had reached a settlement that allowed it to convert the accounts before the one-year ban expired. Upon further consideration, however, Judge Duff allowed in the evidence to ex plain why Universal had rolled over the accounts. Judge Duff warned Universal not to go into the terms of the purported settlement and not to use the terms "negotiation" or "settlement."
 
 
 18
 Richard Rothberg, Universal's president, testified that he thought it was "okay" to convert certain merchant accounts from Bankcard to United Jersey Bank during the one-year period because he "was led to believe that based upon the discussions that had ensued with Mr. Hamman [Bankcard's attorney] and Mr. Jacobs [Universal's attorney at the time] that these accounts were ours to move over, that there was an understanding. When I was told that the arrangements between the two of them had changed, that there was a change of heart on the side of ABC [Bankcard], we ceased to do this anymore because it was going back into a litigation situation." Bankcard filed suit in April 1993, was granted its motion to dismiss the case in May 1993 while settlement talks were underway, and was granted its motion to reinstate the case in June 1993 after the settlement talks broke down. Rothberg testified that Bankcard "dropped the lawsuit" and then later "decided to go forward with the lawsuit and there was no agreement reached in the final stages."
 
 
 19
 In closing argument, Bankcard's counsel said there never was any "agreement" and that it was a "blatant breach of contract" for Universal to go "out ahead early" and convert the merchant accounts. During rebuttal, Universal's counsel said: "You heard in the testimony that there was a suit that was filed. This suit was filed, and this suit was dismissed voluntarily by BAI [Bankcard], and later it was refiled. It was after the--after the conversations going on among the attorneys in which this suit was dismissed voluntarily that Mr. Rothberg, as he had testified, came to the understanding that it was okay for him to take those accounts and roll them over or convert them, which he did at that time. And he also testified that when he was informed by his attorney that no, that was a misunderstanding, now they were going to refile the suit and they were going to go on with the litigation, he stopped."
 
 
 20
 Rule 408 is not an absolute ban on all evidence regarding settlement negotiations. The rule permits evidence that is otherwise discoverable or that is offered for a purpose other than establishing liability. Courts have admitted evidence of offers or agreements to compromise for purposes of rebuttal, see, e.g., Freidus v. First Nat'l Bank, 928 F.2d 793 (8th Cir. 1991); for purposes of impeachment, see, e.g., County of Hennepin v. AFG Indus., Inc., 726 F.2d 149, 153 (8th Cir. 1984); to show the defendant's knowledge and intent, see United States v. Hauert, 40 F.3d 197, 199-200 (7th Cir. 1994); to show a continuing course of reckless conduct and negate the defense of mistake, see Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1362-66 (10th Cir. 1987); and to prove estoppel, see Starter Corp. v. Converse, Inc., 170 F.3d 286, 294 (2d Cir. 1999).
 
 
 21
 It would be an abuse of Rule 408 to allow one party during compromise negotiations to lead his opponent to believe that he will not enforce applicable time limitations and then object when the opponent attempts to prove the waiver of time limitations. See Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence sec. 5312, at 273 n.5 (1980). Similarly, it would be an abuse of Rule 408 to let Bankcard lull Universal into breaching the contract and then prevent Universal from explaining its actions because the lulling took place around the settlement table. Rothberg's testimony was admitted to show his state of mind and to explain why Universal converted accounts. In hindsight, Universal could have avoided this evidentiary quandary by waiting until a settlement was final before relying on Bankcard's word that converting certain accounts would be OK. Nonetheless, to counter Bankcard's argument that Universal had violated the contract, Judge Duff correctly allowed Universal to explain that it convertedaccounts because it thought a settlement had been reached.
 
 
 22
 Rule 408's spirit and purpose must be considered in its application. Central Soya, 676 F.2d at 944. See also Winchester Packaging, 14 F.3d at 320. The purpose of Rule 408 is to encourage settlements. Settlements will not be encouraged if one party during settlement talks seduces the other party into violating the contract and then, when a settlement ultimately is not reached, accuses the other party at trial of violating the contract. To use Rule 408 to block evidence that the violation of the contract was invited would be unfair. The need for Universal to explain it thought a settlement had been reached allowing it to roll over accounts-- without allowing any details about the settlement talks or even use of the word "settlement"--outweighed any potential for discouraging future settlements and did nothing to undermine the purpose and spirit of Rule 408. The admission of Rothberg's testimony that touched on settlement negotiations was not, in our view, grounds for ordering a new trial.
 
 
 23
 The third reason Judge Posner gave for ordering a new trial involved the jury instructions on the RICO claims. Over Bankcard's objection, Judge Duff's RICO jury instructions included a list of 37 alleged predicate acts; the jury had to find that Bankcard committed at least 2 of these acts for a RICO violation. Jury instructions, of course, must have evidentiarysupport. See Quercia v. United States, 289 U.S. 466, 470 (1933); United States v. James, 819 F.2d 674, 675 (7th Cir. 1987). And predicate acts must be indictable activities. See Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992). For a mail and wire fraud RICO violation to exist there must have been intent to defraud. See R.E. Davis Chem. Corp. v. Nalco Chem. Co., 757 F. Supp. 1499, 1512 (N.D. Ill. 1990); Robinson v. City Colleges of Chicago, 656 F. Supp. 555, 558 (N.D. Ill. 1987). Some of the 37 predicate acts lacked any evidentiary support. Other predicate acts, such as placing a telephone call to solicit business or filing a lawsuit, did not charge an action that is indictable under RICO. On only the first of the 37 predicate acts did Judge Duff instruct the jury that the particular act had to have been done with an intent to defraud to qualify as a predicate act. These were serious errors that, in light of the shaky RICO evidence to begin with, cannot be deemed harmless. See Stutzman v. CRST, Inc., 997 F.2d 291, 294 (7th Cir. 1993). Judge Posner certainly made the right call when he ordered the RICO claims to be retried.
 
 
 24
 Because the RICO instruction error at the first trial affected only the RICO claims, however, the new trial should have been limited to that part of the case. Partial trials are proper if the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice. McClain, 139 F.3d at 1128, citing Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931). The danger of spillover prejudice from the erroneous RICO instruction onto the breach of contract claim was minimal. The RICO evidence at the first trial consisted mostly of testimony from other business people who experienced problems with Bankcard, while the breach of contract evidence involved business records and testimony from Universal's officials.
 
 
 25
 Whether Bankcard breached the contract by bollixing up application approvals and shafting Universal on residuals is a very different question from whether Bankcard engaged in a pattern of racketeering. The fact that a jury could hear evidence on both issues and still keep the issues separate was borne out at the second trial, where the jury found again that Bankcard breached the contract but had not violated RICO.
 
 
 26
 After the jury at the second trial determined that Bankcard had breached the contract to the tune of $4.1 million, Judge Posner nullified the verdict and entered judgment for Bankcard, concluding that the evidence of damages was insufficient. Because the sufficiency of the evidence on the amount of contract damages at the first trial was not one of the reasons given for ordering the second trial, we deal with this issue only briefly.
 
 
 27
 Craig Millington, a former MasterCard International executive who later became one of Universal's top managers, testified at the first trial that Universal placed at least 1,100 new merchant accounts with Bankcard for which Universal received no residuals. Millington estimated that each account would have generated about $250 in revenue for Universal per year, which means that Universal should have received $275,000 in residuals for those accounts in the first year alone. Millington testified that Universal's sales force peaked at 110 individuals, that each of those sales personnel could be expected to drum up 75 new accounts per year, and that it cost Universal $4,000 per year to keep each salesperson in the field. Millington also testified that each new account would generate a one-time $500 equipment installation profit for Universal. Finally, Millington testified that Universal had plans to add 50 new sales people per year, who would generate more new accounts and more profits on top of the residuals being produced by accounts signed up in previous years. At closing, Universal's counsel urged the jury to multiply 110salespeople times 75 new accounts per year times $250 in residuals per year ($2,062,500), minus 110 salespeople times $4,000 in annual costs ($440,000), for a total annual lost profit of $1,622,500 in the first year. By factoring in the $500 one-time profit for each new account and the optimistic growth projections for later years, Universal's counsel threw out breach of contract totals as high as $13.8 million and $25.6 million.
 
 
 28
 It is true that Universal's evidence of its costs was sketchy. Certainly, the cost of running this operation had to amount to more than $4,000 per salesperson. That estimate does not appear to account for the costs incurred by Universal's central office, such as Millington's $75,000 salary. On the other hand, Bankcard was not Universal's only business partner, and it is difficult for any business to prorate general overhead costs between different lines of business. Under Illinois law, which governs the breach of contract question, complete speculation regarding lost profits is unacceptable. Oakleaf of Illinois v. Oakleaf & Assoc., Inc., 527 N.E.2d 926, 933 (Ill. App. 1988). Damage awards cannot be based on conjecture or speculation, but absolute certainty or mathematical precision about lost profits is not required. Id. Plus, Illinois courts are reluctant to interfere with the discretion of the jury in its finding of fact regarding damages. SK Hand Tool Corp. v. Dresser Indus., Inc., 672 N.E.2d 341, 348 (Ill. App. 1996). Universal's suggestion that it lost $13 million to $25 million seems to have been based on conjecture and speculation, but the jury did not buy those rosy projections. Though there was not mathematical precision, there was evidence on which the jury could be reasonably certain about a more modest damages award. Universal's evidence of $1,115,000 in damages was scant, although we believe sufficient, at the first trial.
 
 
 29
 Universal goes on to allege that it was prejudiced when Judge Posner committed errors during the second trial on the RICO count. In particular, Universal says the judge erred when he compressed the 37 alleged RICO predicate acts into 3 general categories and when he instructed the jury. We have examined these claims, and not only do we find them meritless, we believe Judge Posner was absolutely right in whittling Universal's blunderbuss approach down to something that was much more understandable for the jury. Also, we believe the challenge to his instructions to the jury is meritless. In short, after reviewing the record, we conclude that Judge Posner conducted an error-free second trial and that Universal's bag of alleged errors is without substance.
 
 
 30
 So we come to the final score. Although Universal does not leave with either of its touchdowns after our replay, it at least gets the equivalent of a field goal. We affirm Judge Posner's grant of a new trial on the RICO claim but reverse his grant of a new trial on the breach of contract claim following the first trial. We affirm the jury's verdict rejecting Universal's RICO claim at the second trial. We hold that the second trial on the breach of contract claim, considering our reinstatement of the verdict the first time around, was a nullity. Finally, the contract between Universal and Bankcard provides that in the event of disputes, the prevailing party is entitled to attorneys fees. As we see it, there is no true prevailing party in this case. Universal clearly overreached, and we do not view it as the prevailing party based on the unusual circumstances of this protracted litigation. Though Universal is now getting something rather than nothing, what it is netting is only a pittance of the $25.6 million it asked the first jury to award on the breach of contract claim. Accordingly, we believe no attorneys fees or costs should be awarded to either side as a result of the two trials or from the prosecution or defense of this appeal. See Perlman v. Zell, 185 F.3d 850, 858-59 (7th Cir. 1999).
 
 
 31
 To summarize our findings, Universal is entitled to $1.115 million, all from the first judgment on the state breach of contract claim. The $6.69 million that Judge Posner rejected from the first trial's federal RICO judgment remains stricken. The second trial was a nullity on the breach of contract claim and a loss for Universal on the RICO claim. That result is affirmed. No costs or attorneys fees at the district court level or in this court are awarded. The case is remanded to the district court for the entry of an amended judgment.
 
 So ORDERED
 
 
 Notes:
 
 
 [1]
 It is a testament to the dedication of Chief Judge Posner that he volunteered to sit in the district court and hear this case which, at the time, needed the guiding hand of a new judge. Judge Posner, of course, carries a full load of cases on this court. He also discharges a multitude of administrative duties as the circuit's chief judge. But that's only part of what he does. He has written more books than many people read in a lifetime. On top of all this, in his spare time he is working as a court-appointed special mediator in the government's blockbuster antitrust suit against Microsoft. Obviously, Judge Posner has more on his plate than a long- haul trucker working an "all you can eat" buffet line. It is a tribute to Judge Posner's talent that he handles his many roles with such vigor, brilliance, and panache.
 
 
 [2]
 When the decision on whether to grant or deny a new trial depends on the evidence, appellate courts sometimes grant less deference to the trial court when a new trial has been ordered than when a new trial has been denied. See, e.g., Brady v. Fort Bend County, 145 F.3d 691, 713 (5th Cir. 1998), cert. denied, 119 S. Ct. 873 (1999); Wilburn v. Maritrans GP Inc., 139 F.3d 350, 363 (3d Cir. 1998); Hutchinson v. Stuckey, 952 F.2d 1418, 1420-21 (D.C. Cir. 1992). Here, however, there was no such second-guessing. In ordering a new trial Judge Posner was not disagreeing with the first jury's verdict, but determined that there were prejudicial flaws in the evidence allowed to reach the jury and in the instructions.