T.C. Memo. 1996-487


UNITED STATES TAX COURT


LEE D. FROEHLICH, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15382-94.          Filed October 19, 1996.


P, P's accountant, and R's counsel engaged in a
pretrial conference.  The conference began with a
discussion of settlement.  R's counsel did not believe
that settlement would be achieved and, from his
perspective, he began what he believed to be a
discussion of matters to be stipulated for trial.  P
and his accountant, who were not familiar with the
pretrial procedures of this Court, believed that the
settlement discussions had continued.  The matter
discussed between R's counsel, P, and P's accountant
involved whether there had been a duplication of a
$400,000 amount and whether P was entitled to losses
that were capital or ordinary in character.  R, at
trial, offered statements made by or on P's behalf as
admissions against P's interest.  P contends that Fed.
R. Evid. 408 prohibits R's offer of admissions because
the statements were made in the context of settlement
negotiations.
    <u>Held</u>:  Under Fed. R. Evid. 408 both offers of
settlement and statements made during settlement
negotiations are not admissible to prove liability or

invalidity of a claim.  Held, further:  It was substantially unclear to P and his accountant that settlement negotiations had concluded; any admissions made are not admissible under Fed. R. Evid. 408.  Held, further:  P's loss was capital in nature.  Held, further:  P is not liable for the accuracy-related penalty under sec. 6662(a), I.R.C. for reasons stated herein.

Steve Mather, for petitioner.

Mark A. Weiner, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined a deficiency in petitioner's 1987 Federal income tax in the amount of $94,794, and an addition to tax pursuant to section 6661[1] in the amount of $23,699.  Respondent also determined a deficiency in petitioner's 1990 Federal income tax in the amount of $4,983 and an accuracy-related penalty pursuant to section 6662(a) of $997.

The principal controversy here is whether petitioner has established that his dominant motivation in guaranteeing the floor plan line of credit was to secure or protect his trade or business of being an employee.  This, in turn, controls whether petitioner is entitled to deduct a $400,000 payment made to a bank as a business bad debt pursuant to section 166(a).  If we

---

[1] All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

determine that it is not deductible as a business bad debt, then petitioner is entitled to claim the $400,000 as a short-term capital loss; i.e., a nonbusiness bad debt. Sec. 166(d)(1) and (2). We also consider whether petitioner is liable for an accuracy-related negligence penalty pursuant to section 6662(a) for the taxable year 1990.[2]

## FINDINGS OF FACT[3]

Lee D. Froehlich (petitioner), at the time of the petition in this case, resided in Simi Valley, California. Petitioner, at various times, has been engaged in the field of selling new and used automobiles. Petitioner's professional career has been in the retail automobile business, including positions such as salesperson, sales manager, general manager, and, ultimately, owner of a dealership. For the relevant years, petitioner was president and owner of FRO Enterprises, Inc., an Acura automobile dealership (the auto dealership).

In 1967, petitioner was inducted into the U.S. Army, thus interrupting his college education at the University of Nebraska. In 1969, petitioner began developing skills and expertise selling automobiles in Kansas City, Kansas. Petitioner also received management training during this particular interval. From 1972

---

[2] Respondent has conceded that petitioner is not liable for the sec. 6661 addition to tax for the taxable year 1987.

[3] The parties' stipulations of facts and exhibits are incorporated by this reference.

through 1975, petitioner was employed by automobile dealerships in Montana, where he met Mr. Jack Robertson (Robertson), who offered him a job selling Honda automobiles. Petitioner was employed by Robertson Honda during 1975 through 1977. For the next year and a half, petitioner was the manager of used-car sales at a Ford dealership.

In 1979, petitioner returned to Robertson Honda and worked there until 1986. During the last several years of his employment in Robertson Honda, petitioner was the general manager, and he earned $318,172 and $202,612 for 1985 and 1986, respectively. Petitioner enjoyed an "excellent" working relationship with Robertson. However, petitioner believed there was no room for further advancement within Robertson Honda. Also, petitioner surmised that his position with Robertson Honda was precarious because he was making twice as much as other general managers in comparable employment.

Petitioner believed that if he owned his own auto dealership, he could earn several times his earnings at Robertson Honda, which averaged $250,000 annually in the years approaching 1986. Petitioner believed that the general manager of the Flagstaff dealership earned approximately $100,000 to $150,000 annually. Petitioner believed that the owner of his own dealership could earn $750,000 annually. Petitioner understood that Robertson initially earned $500,000 per year, but ultimately

increased his salary to $3 million.  Petitioner desired to attain that level of compensation.  He also sought to work less hours and to pursue leisure activities such as golf.  Thus, petitioner wanted to own an auto dealership in order to maximize career and salary opportunities.

Robertson assisted petitioner in obtaining an automobile dealership franchise from American Honda Motor Co., Inc. (American Honda).  American Honda advised that Honda dealerships were not available and suggested, instead, an Acura dealership. The Acura dealership, however, could only be assigned to Robertson because of American Honda company rules that required preference be given to current dealers.  Acura offered Robertson a dealership in the San Fernando Valley in southern California.

On March 1, 1985, the Acura Automobile Division, a subsidiary of American Honda, submitted a letter of intent to Robertson that his application for an Acura automobile dealership had been tentatively approved.  Robertson was assigned the area around Woodland Hills, California.  The letter of intent contained the estimate that the land and building would cost approximately $126,882 to conform to Acura's requirements and that the facility was to be completed no later than March 15, 1986.  Finally, American Honda notified Robertson that, as part of its marketing strategy, another Acura dealership would be opening in nearby Van Nuys, California.

Robertson sold petitioner the rights to the Acura dealership for the nominal sum of $1. Petitioner submitted a business plan to American Honda. Subsequently, American Honda issued the Acura dealership to petitioner. The auto dealership, however, was ultimately located in Calabasas, California.

As a prerequisite to obtaining the Acura dealership, American Honda required petitioner to invest $806,000 in capital assets. At that time, petitioner had no major financial obligations, and he possessed financial resources of approximately $250,000. Petitioner expected to borrow the balance of the money needed to meet the $806,000 capital threshold.

Intially, petitioner contributed $209,163 in cash to the auto dealership. Of this amount, $196,921.05 was expended for deposits, legal fees, signs and logos, office supplies, office furniture, ceremony expenses, secretarial salaries, public relations, promotional expenses, and transfers to business accounts. Petitioner also selected the location of the auto dealership as well as the design, acquired approval from county and State authorities, hired and trained staff, and engaged in other preliminary matters.

In petitioner's auto dealership's financial statement, his cash contribution was reflected as "Other" in the category "Total Current Assets". Petitioner also contributed two automobiles,

with a total value of approximately $40,000.  These items were placed in the auto dealership's used car inventory, and were deemed to be assets on the company's books.  As part of the $806,000 capital requirement, petitioner executed a note in favor of the auto dealership for approximately $150,000.  At the end of the first year of the business, petitioner paid off this note from a bonus of $236,000 that he received from the auto dealership.

The additional $400,000 needed to meet the $806,000 capital requirement was to be borrowed from Golden State Sanwa Bank (Sanwa Bank).  In a July 9, 1986, letter setting forth Sanwa Bank's terms and conditions for the capitalization loan (cap loan), petitioner is denominated as "Borrower" and the auto dealership as the "Guarantor".  The stated purpose of the loan is for "Permanent Working Capital".

On March 2, 1987, Sanwa Bank entered into a business loan agreement with petitioner for the cap loan.  The $400,000 promissory note contains the statement that the loan is "To assist with investment in auto dealership to meet permanent working capital needs of enterprise."  Petitioner is shown as the borrower, and his occupation is listed as owner of the dealership.  On the same date, a Sanwa Bank corporate resolution reflects that the auto dealership guaranteed the repayment of

petitioner's debt, and petitioner is denominated as "President" of the corporate entity, FRO Enterprises, Inc.

Finally, Sanwa Bank prepared two documents that were both entitled "Continuing Guaranty". The first one, typewritten and dated March 2, 1987, states that the cap loan of $400,000 was made to the auto dealership. In this document, petitioner is denominated "Guarantor" and the auto dealership "Debtor". On the top front page of the first document is the word "Backwards" in handwriting. The second document bears a handwritten date of March 2, 1987. The second document extends the cap loan to petitioner, and the auto dealership is listed as the "Guarantor". On top of the second document is handwritten: "$400,000 cap loan, 9/27/89, to replace note signed backwards".

Cap loans were common in the automobile industry. Typically, these loans were made to the corporate entities. Petitioner's bank records, however, reflect that he deposited the $400,000 cap loan proceeds into his personal account and then transferred the funds to the auto dealership. The March 1987 dealer financial statement reflected petitioner's initial capital contribution consisting of the $400,000 cap loan and petitioner's other contributions of approximately $400,000.

On July 9, 1986, petitioner obtained a $2,500,000 floor plan line of credit. The auto dealership is listed as the "Borrower". This particular loan was required to be renewed annually. A

floor plan loan is intended to finance the purchase of new car inventory through the time they are sold. Under floor plan loans, the lender purchases automobiles that are received in the auto dealership's inventory. Each time an automobile is sold, the dealership is required to pay the lender the cost of that automobile.

On August 4, 1987, Sanwa Bank informed the auto dealership, attention of petitioner, that the floor plan line of credit for $2,500,000 had been increased to $3,500,000, effective July 29, 1987. The auto dealership, represented by petitioner, in an unsigned and undated document entitled "Certified Corporate Resolution To Borrow", sought to borrow up to $3,500,000 from Sanwa Bank.

On July 31, 1988, Sanwa Bank increased the floor plan loan to $5 million. Sanwa Bank issued a promissory note entitled "Commercial Optional Advance Promissory Note". Petitioner's name is shown on the document as president of the auto dealership. On the same date, in a related document entitled "Continuing Guaranty", petitioner was listed as "Guarantor".

Petitioner's auto dealership opened March 1987 and during the first 2 years, it was the number one Acura dealer in the United States. In the middle of 1989, petitioner's auto dealership began experiencing financial reverses because of an economic downturn in the State of California and because of the

introduction of another luxury automobile (Lexus).  Finally, two other Acura dealers in Thousand Oaks and Van Nuys, California, respectively, opened sometime in 1989.

When petitioner's auto dealership suffered financial reverses, it fell "out of trust" on its floor plan.  A floor plan is out of trust when the remaining inventory of automobiles is insufficient to cover the floor plan loan.  Consequently, there was a possibility that Sanwa Bank would not renew the floor plan loan.  Sanwa Bank required petitioner to reduce the amount outstanding on the floor plan.  In order to reduce the amount outstanding, petitioner decided to sell his home and disburse a significant portion of the proceeds to Sanwa Bank.  Petitioner was compelled to reduce the amount "out of trust" with respect to the floor plan loan because he had personally guaranteed the entire amount, and, if Sanwa Bank chose not to renew the loan, the auto dealership would have gone out of business.

On October 15, 1989, the auto dealership entered into an agreement to extend and/or modify a promissory note for the floor plan.  In this agreement, the maturity of the July 31, 1988, promissory note was extended to December 1, 1989. Petitioner, as president of the auto dealership, signed the agreement as "Borrower".

On February 5, 1990, petitioner irrevocably transferred a Deed of Trust for petitioner's home to Sanwa Bank.  The Deed of

Trust states that Sanwa Bank, as the beneficiary, would receive payment of an indebtedness in the amount of $400,000. On February 6, 1990, Sanwa Bank presented the escrow company with a demand note as well as the original, unrecorded, Deed of Trust for petitioner's home. It was Sanwa Bank's understanding that the escrow company would disburse $400,000 to Sanwa Bank at the close of escrow.

On March 2, 1990, petitioner's home was sold for $1,225,000, and Sanwa Bank received $400,000 from the sale proceeds. Sanwa Bank applied the funds distributed from the escrow company toward the floor plan loan. Ultimately, however, on April 30, 1990, Sanwa Bank did not renew the floor plan loan, and, instead, foreclosed on petitioner's auto dealership and liquidated and sold the assets. Afterwards, Sanwa Bank sought payment for the approximately $1.1 million outstanding balance due on the floor plan loan. Petitioner did not receive any of the foreclosure proceeds.

On the auto dealership's Federal income tax returns for the 1987 through 1990 tax years, it reported the following:

| Years | Gross Receipts | Gross Profit | Total Income[1] | Taxable Income |
|-------|---------------|--------------|-----------------|----------------|
| 1987 | $27,674,310 | $3,010,606 | $3,959,332 | $43,644 |
| 1988 | 35,089,014 | 3,587,666 | 4,554,151 | (271,712) |
| 1989 | 35,522,931 | 4,101,084 | 4,889,409 | (570,637) |
| 1990 | 4,713,561 | 588,810 | 239,916 | (699,459) |

[1]This column reflects gross profits plus other income such as cash discounts, miscellaneous income, finance and insurance income, as well as service contracts.

Petitioner reported on his Federal income tax returns the following amounts of income:

| Years | Salary |
|-------|--------|
| 1985 | $318,172 |
| 1986 | 202,612 |
| 1987 | [1]516,233 |
| 1988 | 180,000 |
| 1989 | 152,400 |
| 1990 | [2]127,700 |
| 1991 | 127,000 |
| 1992 | 104,000 |
| 1993 | 104,000 |
| 1994 | 156,000 |

[1]This figure has been rounded off to the nearest dollar. In that year, petitioner obtained a salary of $280,000, and received a bonus of $236,000. The bonus went back to petitioner's auto dealership to pay off the $150,000 note and a $80,000 loan he received from the dealership.
[2]Petitioner received $45,200 prior to the loss of his auto dealership.

As a dealer/owner, petitioner received a total of $893,833 in income from the auto dealership while it was in business.

Petitioner, on Schedule D of his 1990 Federal income tax return, claimed $350,000 in capital losses under section 1244 and an additional, unspecified, $50,000 loss. In addition, the $400,000 paid to Sanwa Bank from the foreclosure proceeds was claimed as a loss on petitioner's Schedule C as "personal guarante [sic] of loan from corporation".

After the termination of petitioner's auto dealership, he worked almost 6 months as the manager of a Ford dealership in Orange County, California. Thereafter, Acura requested petitioner to assist a Huntington Beach, California, dealer.

Petitioner worked in the Huntington Beach dealership for approximately 1 year. He then worked for a Honda dealership in Pasadena, California, for 1 year. As of the time of trial, petitioner had been working for approximately 2 years with a Ford dealership in Thousand Oaks, California.

Petitioner's accountant, Jesse Greenspan (Mr. Greenspan) was not aware that petitioner had personally borrowed $400,000 from Sanwa Bank. Petitioner's auto dealership's accountant, Judith Rugh (Ms. Rugh), worked for an accounting firm that provided services for approximately 30 clients which were auto dealerships. Ms. Rugh believed that, generally, petitioner's business maintained a fairly accurate set of books. Ms. Rugh also believed that petitioner's salary for the 1987 calendar year was probably low when compared to other auto dealers that she was familiar with.

On September 22, 1995, respondent's representatives met with petitioner and his accountant. The meeting lasted approximately 2 hours. Respondent's counsel believed that the purpose of the meeting was to engage in preparation for trial. Petitioner and his accountant, Mr. Greenspan, believed that it was a settlement conference concerning the $400,000 capital contribution claimed as a stock loss and whether that was a different amount from the $400,000 bad-debt deduction. Petitioner and Mr. Greenspan presented numerous documents to prove that there were two

$400,000 amounts involved in the questioned transactions. These documents were photocopied by respondent's counsel and an assistant.

The conference began with a settlement discussion between petitioner and respondent's counsel. The brief settlement discussion was followed by the consideration of the merits of respondent's legal stance. During the conference, respondent's counsel informed petitioner and his accountant about the Tax Court's stipulation requirement. Towards the end of the meeting, respondent's counsel advised petitioner to obtain counsel. After the meeting, petitioner and respondent's counsel engaged in a series of telephone conversations discussing whether there were two separate $400,000 amounts claimed in the 1990 Federal income tax return or whether there had been a duplication of a $400,000 amount.

Prior to trial, the counsel who represented respondent during the pretrial phase withdrew to enable him to testify about statements made by or on behalf of petitioner at the conference. New counsel represented respondent at the trial.

OPINION

The primary issue for our consideration is whether petitioner's loss of $400,000 resulting from his guaranty is deductible as "ordinary" or "capital". Preliminary to considering the merits of the primary issue, we consider an evidentiary matter.

A. <u>Evidentiary Matter</u>

At trial, respondent proffered her counsel's testimony to offer admissions against interest made by or on behalf of petitioner. See Fed. R. Evid. 801(d)(2). Petitioner seeks to exclude all of respondent's counsel's testimony on the ground that it consisted of statements made in the course of settlement negotiations.

Proceedings in this Court are conducted in accordance with the Federal Rules of Evidence. Sec. 7453; Rule 143. Rule 408 of the Federal Rules of Evidence provides as follows:

<u>Rule 408. Compromise and Offers to Compromise</u>

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

This proscription is limited to evidence of settlement negotiations and documents concerning the compromise of a claim. In addition, the limitation on using such evidence applies only

when it is being offered to show liability, or that some underlying claim is invalid.  Id.

The legislative history of rule 408 of the Federal Rules of Evidence indicates that the purpose thereof is to encourage settlements.  See United States v. Contra Costa County Water Dist., 678 F.2d 90, 92 (9th Cir. 1982); Central Soya Co. v. Epstein Fisheries, Inc., 676 F.2d 939, 944 (7th Cir. 1982); Hulter v. Commissioner, 83 T.C. 663, 665 (1984).  The underlying premise is that, without the rule, settlement negotiations would be inhibited if the parties knew that statements made in the course of settlement might later be used against them as admissions of liability.  United States v. Contra Costa County Water Dist., supra at 92; Central Soya Co. v. Epstein Fisheries, Inc., supra at 944; Hulter v. Commissioner, supra at 665.[4]

Petitioner contends that a meeting with respondent's counsel was a settlement conference, and, hence, statements made by

---

[4] See also Saltzburg & Redden, Federal Rules of Evidence Manual, 191 (3d ed. 1982):

> In most cases * * * the Court should decide against admitting statements made during settlement negotiations as impeachment evidence when they are used to impeach a party who tried to settle a case but failed. The philosophy of the Rule [408] is to allow the parties to drop their guard and to talk freely and loosely without fear that a concession made to advance negotiations will be used at trial.  Opening the door to impeachment evidence on a regular basis may well result in more restricted negotiations.

petitioner are within the ambit of rule 408 of the Federal Rules of Evidence. Petitioner primarily relies on the second sentence of rule 408 of the Federal Rules of Evidence, which states "Evidence of conduct or statements made in compromise negotiations is likewise not admissible." The exception contained within rule 408 of the Federal Rules of Evidence for "evidence otherwise discoverable" mitigates the general rule where evidence is discoverable from a source independent of the settlement negotiations. See Hulter v. Commissioner, supra, at 665-666. The purpose of this exception is to prevent parties from insulating evidence that is obviously damaging to them by incorporating the evidence in settlement discussions and/or offers.

In general, rule 408 of the Federal Rules of Evidence states a broad proscription excluding statements made during settlement negotiations when offered to prove the validity or amount of a claim. Specifically, this rule does not distinguish between offers to settle and admissions of fact made during settlement negotiations. See Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652 (4th Cir. 1988). Accordingly, the issue here is not whether the statement was one that was made as an offer to settle, but whether it was made during settlement negotiations.

Thus, we must inquire here, as a factual matter, whether petitioner's admissions were made during a settlement conference.

Petitioner and Mr. Greenspan believed that the case could be settled if it could be established that there were two distinct elements in petitioner's 1990 Federal income tax return--the $400,000 capital contribution taken as a loss and the $400,000 bad-debt deduction. Petitioner and Mr. Greenspan brought records to substantiate this particular contention. During this meeting, the records were photocopied by respondent's counsel and his assistant. This, in addition to the obvious settlement discussion in the beginning of the meeting, caused petitioner to believe that the entire session was for the purpose of settlement.

Respondent's counsel, who is sophisticated and experienced in such matters, delineated between the initial settlement discussion and the beginning of the process of stipulating facts for trial. Petitioner and Mr. Greenspan, however, were not sophisticated and experienced in such matters. It was only toward the end of the meeting, when respondent's pretrial counsel advised petitioner to obtain counsel, that it could have become clear to them that the subject matter had turned to preparation for trial as opposed to settlement discussions. In addition, the subsequent telephonic discussions between petitioner and respondent's counsel concerned the question of duplicated $400,000 amounts and could have given petitioner the impression that the possibility of settlement was still under discussion.

In sum, the record does not persuade us that settlement discussions had ended prior to the purported admissions by petitioner.  Examining the totality of the circumstances, we believe it is consonant with the purpose of rule 408 of the Federal Rules of Evidence, to decline to include the purported statements made by petitioner in the record.  Hence, petitioner's motion to exclude respondent's counsel's testimony will, accordingly, be granted.

B.  Capital Versus Ordinary Loss

Petitioner guaranteed the auto dealership's floor plan loan, which was utilized to purchase automobiles from the manufacturer for inventory purposes.  Three years later, petitioner's assets were used to make a $400,000 payment to Sanwa Bank to fulfill the guaranty obligation, which petitioner deducted as a business bad debt.  Respondent contends that the bad debt is a nonbusiness bad debt and may not, therefore, be used to generally reduce ordinary income.  In other words, respondent determined that petitioner is entitled to a short-term capital loss, and petitioner bears the burden of establishing that respondent's determination is erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Also, deductions are a matter of legislative grace, and petitioner has the burden of proving his entitlement to the claimed deductions.  See New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Generally, section 166(a) provides that a taxpayer may deduct a bad debt in full in the year it becomes worthless. Under section 166, worthless business bad debts are fully deductible from ordinary income. On the other hand, worthless nonbusiness bad debts are treated as short-term capital losses. Secs. 166(d)(1)(B), 1222(2). A nonbusiness bad debt is defined in section 166(d)(2) as a debt other than:

> (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

> (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

When a taxpayer guarantees a debt in the course of his trade or business, payment of part or all of the taxpayer's obligations as guarantor is treated as a business bad debt in the taxable year in which the payment is made (assuming the taxpayer's right of subrogation against the debtor is worthless). If the guarantee was made in the course of the taxpayer's trade or business, the loss can be used to reduce ordinary income in the year of payment. Sec. 1.166-9(a), Income Tax Regs. However, if the agreement guaranteeing the debt was entered into for profit, but not in the course of the taxpayer's trade or business, the loss is a short-term capital loss in the year in which the guarantor pays the debt. Weber v. Commissioner, T.C. Memo. 1994-341; Smartt v. Commissioner, T.C. Memo. 1993-65; Brooks v. Commissioner, T.C. Memo. 1990-259; sec. 1.166-9(b), Income Tax

Regs.  Whether a taxpayer is engaged in a trade or business is a question of fact.  United States v. Generes, 405 U.S. 93, 104 (1972); sec. 1.166-5(b), Income Tax Regs.

To obtain a business bad-debt deduction, the taxpayer must establish that (1) he was engaged in a trade or business, and (2) the acquisition or worthlessness of the debt was proximately related to the conduct of such trade or business.  Putoma Corp. v. Commissioner, 66 T.C. 652 (1976), affd. 601 F.2d 734 (5th Cir. 1979); sec. 1.166-5(b), Income Tax Regs.  Whether a particular guaranty is proximately related to the taxpayer's trade or business depends upon the taxpayer's dominant motivation for becoming a guarantor.  United States v. Generes, supra at 104; Harsha v. United States, 590 F.2d 884 (10th Cir. 1979); French v. United States, 487 F.2d 1246 (1st Cir. 1973); Stoody v. Commissioner, 66 T.C. 710 (1976), vacated on another issue 67 T.C. 643 (1977); Weber v. Commissioner, T.C. Memo. 1994-307; Smartt v. Commissioner, supra.

In determining whether the taxpayer's dominant motivation was to protect his salary or to protect his investment, the Courts have compared the taxpayer's salary, the value of his investment, and other motivating factors at the time he guaranteed the loan.  United States v. Generes, supra at 106; Putoma Corp. v. Commissioner, supra at 674 n.32; Schwartz v. Commissioner, T.C. Memo. 1995-415; Garner v. Commissioner, T.C.

Memo. 1991-569, affd. 987 F.2d 267 (5th Cir. 1993).[5]  Also, we may examine how the taxpayer would have benefited from the loan or guarantee had the loan not gone bad.  <u>Tennessee Sec., Inc. v. Commissioner</u>, 674 F.2d 570, 574 (6th Cir. 1982), affg. T.C. Memo. 1978-434.  Finally, in determining the taxpayer's dominant motivation, objective facts take precedence over unsupported statements of subjective intent.  <u>Kelson v. United States</u>, 503 F.2d 1291 (10th Cir. 1974).

When a guarantor of a corporate debt is a shareholder and also an employee, mixed motives for the guaranty are often present, and the critical issue becomes which motive is dominant. <u>United States v. Generes</u>, <u>supra</u> at 100.  "[I]nvesting is not a trade or business".  <u>Whipple v. Commissioner</u>, 373 U.S. 193, 202 (1963).  An employee's motive for guaranteeing a loan may be to

---

[5] The Court of Appeals for the Fifth Circuit stated:

> <u>Generes</u> and its progeny have established objective criteria to aid courts in their search [for dominant motive].  Our investigation centers around three factors: the size of the taxpayer's investment, the size of his after-tax salary, and the other sources of gross income available to the taxpayer at the time of the guarantees.  [<u>Garner v. Commissioner</u>, 987 F.2d 267, 270 (5th Cir. 1993); affg. T.C. Memo. 1991-569; citation omitted.]

The Court of Appeals for the Ninth Circuit stated generally that <u>Generes</u> stood for the proposition that the proper characterization of a worthless debt as "business" or "nonbusiness" was a question of fact to be established by the individual circumstances of each case.  <u>Hunsaker v. Commissioner</u>, 615 F.2d 1253, 1256 nn.3 & 4 (9th Cir. 1980).

protect one's employment or salary. <u>Weber v. Commissioner</u>, T.C. Memo. 1994-341. "[I]t must be clear from the record that the primary reason for making the advances which gave rise to the debts was business related rather than investment related". <u>Smith v. Commissioner</u>, 60 T.C. 316, 319 (1973).

Generally, returns from investing result from appreciation and earnings on the investment rather than from personal effort or labor. <u>United States v. Generes</u>, <u>supra</u> at 100-101. Conversely, one's role or status as an employee is a business interest. It typically involves the exertion of effort and labor in exchange for a salary. <u>Id.</u>; see also <u>Litwin v. United States</u>, 983 F.2d 997 (10th Cir. 1993); <u>Smartt v. Commissioner</u>, <u>supra</u>.

If the dominant motive was to increase the value of petitioner's stock in the auto dealership, then the loan was a nonbusiness investment. If the dominant motive was to increase or protect the taxpayer's salary, then the loan was a business debt. If both outcomes occurred, then a consideration of all of the relevant facts, emphasizing the objective factors and giving controlling weight to no one single factor (the <u>Generes</u> approach), should be utilized. <u>Litwin v. United States</u>, <u>supra</u>; <u>Smartt v. Commissioner</u>, <u>supra</u>.

Respondent has conceded that the $400,000 business bad-debt deduction claimed on petitioner's 1990 Federal income tax return arises from the $400,000 payment on the floor plan loan, which is

separate and distinct from any other $400,000 amount; i.e., the cap loan and the contributions, separately. Respondent also concedes that petitioner was in the business of being an auto dealership employee. However, respondent does not agree that petitioner's dominant motive at the time of the guarantee was related to any trade or business. Respondent argues that the guarantee was made to protect petitioner's investment in the auto dealership.

A related issue concerns the appropriate timeframe within which to measure petitioner's motivation in guaranteeing the floor plan loan. Respondent asserts that petitioner's dominant motivation should be measured from the time when he last negotiated for an extension and personally guaranteed an extension for the floor plan loan in October 1989. Petitioner contends that the correct time was when the business opened in March 1987.

Generally, a taxpayer's motivation is determined as of the date upon which the taxpayer made the guarantee rather than the date upon which a payment in discharge of liability as guarantor is made. Harsha v. United States, supra; French v. United States, supra; Smartt v. Commissioner, T.C. Memo. 1993-65. Specifically, the focus of inquiry on a taxpayer's dominant motivation is at the time the taxpayer incurs the obligation, not

when the payment is made.  French v. United States, supra at 1248; Smartt v. Commissioner, supra; Modell v. Commissioner, T.C. Memo. 1983-761; Cho v. Commissioner, T.C. Memo. 1976-318.[6] Petitioner personally guaranteed payment of the entire floor plan loan as early as July 31, 1988.  The last record of an extension of the guarantee, on October 15, 1989, however, reflects that petitioner signed a promissory note to extend the floor plan loan to December 1, 1989.  We are unable to view the extension(s) of the guarantee as a new commitment.  As its nomenclature indicates, an "extension" merely continues the original obligation.  Thus, petitioner's motivation with respect to the floor plan arrangement is measured as of July 31, 1988.

1.  Petitioner's Investment--Petitioner owned all the outstanding stock of the corporate dealership.  His total contribution was composed of two amounts each approximating $400,000.  The first $400,000 was comprised of petitioner's liquid assets of $250,000 and a $150,000 note.

In attempting to minimize the relative size of his investment in the dealership, petitioner argues that it would not

---

[6] The statute and the regulations do not tell us at what point in time we should look to determine proximity in a guaranty context. * * * [Case precedent holds] that the time to determine proximity is the time when petitioner entered into his guarantee agreements.  [Cho v. Commissioner, T.C. Memo. 1976-318.]

have been reasonable for him to make multimillion dollar guarantees to protect a $250,000 cash investment. Also, he argues that his salary from his auto dealership matched his out-of-pocket contributions. This contention misconstrues petitioner's stake in the auto dealership. Focusing on the second $400,000 component of the $806,000, the cap loan, petitioner contends that he did not individually borrow that amount from Sanwa Bank. The record, however, reflects that on July 9, 1986, Sanwa Bank notified petitioner that he was approved for the cap loan. In that letter, petitioner is denominated "borrower" and the auto dealership "guarantor". Also, in the March 2, 1987, business loan agreement, petitioner is again shown as the borrower. Sanwa Bank's corporate resolution confirming the parties' intentions regarding the cap loan also shows petitioner as borrower.

The two guaranty extension documents reflect Sanwa Bank's intention to hold petitioner personally liable for the cap loan. Although one of the documents shows petitioner as guarantor, the sequence of events and documents demonstrate that the original guaranty was in error, and, in due time, was corrected. We also note that petitioner deposited the proceeds of the cap loan in his personal bank account and disbursed from that account the moneys to the auto dealership, thereby exercising dominion and control over the loan proceeds.

Moreover, by securing the cap loan, petitioner was able to raise the money necessary for the opening of the auto dealership. Thus, in total, petitioner personally contributed approximately $806,000 to the auto dealership. This investment was substantial in nature.

At the inception of the auto dealership, petitioner secured a $2.5 million floor plan arrangement to acquire inventory (automobiles). Initially, petitioner was not required to personally guarantee the floor plan arrangement. It was not until July 31, 1988, that petitioner personally guaranteed the floor plan loan. By that time, the floor plan amount had increased significantly, permitting the auto dealership to have an expanded inventory base.

The record, generally, reflects that petitioner's dominant motivation was as an investor. His motivation in guaranteeing the floor plan loan was to protect his investment in the business of the auto dealership, as opposed to protecting his trade or business as an employee.

Finally, in 1989, Sanwa Bank was concerned that the floor plan amount was "out of trust" and requested that petitioner decrease the outstanding loan. In the process, Sanwa Bank received a $400,000 security interest in petitioner's home. Sanwa Bank received $400,000 from the March 2, 1990, sale proceeds from petitioner's home. Again, petitioner's dominant

motivation was to protect his equity investment in the auto dealership. Without the floor plan loan, petitioner's auto dealership would have been critically impaired. See Tennessee Sec., Inc. v. Commissioner, 674 F.2d at 574.

Overall, petitioner invested and assumed liabilities of almost $700,000 and guaranteed several million dollars worth of inventory. In contrast, his total salary over the same 4 years was $893,833. In addition, petitioner remained liable for the $1.1 million debt due Sanwa Bank after the foreclosure. These figures contradict petitioner's argument that his total salary comported with his exposure to liabilities.

2. Petitioner's Salary--Petitioner contends that he was apprehensive about his position in Robertson Honda because his salary was higher than comparable general managers, motivating him to acquire an automobile dealership. Although petitioner stated his beliefs as to general managers' salaries, no comparable salaries of general managers were offered. Also, petitioner had an "excellent" working relationship with the owner of Robertson Honda, who assisted petitioner in obtaining an Acura dealership franchise. These factors undermine petitioner's contentions about the precarious nature of his salary and tenure with Robertson Honda.

Petitioner asserts that he expected to make a salary ranging from $750,000 to $3 million. His salary speculations were more

anecdotal than factual.  We note that petitioner did not offer Robertson's testimony or that of other auto dealers.

Petitioner did offer the testimony of Ms. Rugh, the auto dealership's accountant.  Ms. Rugh thought petitioner's salary was low when compared to other auto dealers with which she was familiar.  Petitioner, however, did not provide a plausible explanation as to why his salaries were substantially less than he testified others were, especially considering the exclusivity of his auto dealership's geographic market (the San Fernando Valley) for the first 2 years.  In that regard, petitioner's auto dealership was the number one Acura dealership in the nation for its first 2 years.

Finally, subsequent to the foreclosure of the auto dealership, petitioner's salary level working for other dealerships was comparable to his earnings when he worked for his own dealership.  Accordingly, petitioner knew that with his experience and background in the automobile sales field, he would be able to obtain employment and commensurate levels of compensation elsewhere.

3.  Other Factors--During the first 2 years, petitioner's business was the number one Acura dealership in the country.  His auto dealership demonstrated, generally, increases in gross receipts of $7,414,704, gross profits of $577,060, and total income of $594,819 in 1988 compared to the year before.  Despite

these increases, petitioner received a salary of $180,000 in 1988 compared with $516,232.65 in 1987. In spite of increased gross profits for 1988 and 1989, petitioner's salary declined from $180,000 in 1988 to $152,400 in 1989. There is no indication that there was any limitation on petitioner's ability to pay himself a salary. He was the sole owner and submitted a business plan to American Honda.

This salary pattern suggests that petitioner wanted to protect his equity interest. We hold that petitioner expected returns primarily from appreciation and earnings on his investment rather than in the form of salary from personal effort or labor on his part. United States v. Generes, 405 U.S. at 100-101. Accordingly, if the auto dealership were successful, petitioner's reward would be realized primarily through sale or other disposition of his stock interest, rather than his salary. Putoma Corp. v. Commissioner, 66 T.C. at 674.

Accordingly, petitioner's dominant motive in paying amounts pursuant to his guaranty of the floor plan loan was to protect his investment in the dealership and, accordingly, the resulting loss was capital in nature, deductible only as a nonbusiness bad debt.

Accuracy-Related Penalty Under Section 6662(a)

Respondent determined that petitioner was liable for the accuracy-related penalty pursuant to section 6662(a). Section

6662(a) provides a penalty equal to 20 percent of the portion of the underpayment, in this case, that is attributable to negligence or disregard of the rules or regulations. Sec. 6662(a) and (b)(1). The burden is on the taxpayer to show a lack of negligence. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the question of negligence, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their transactions and reporting position. McPike v. Commissioner, T.C. Memo. 1996-46.

A taxpayer may avoid liability for negligence by relying on competent professional advice, if it was reasonable to rely on such advice. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011, 1017 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an

absolute defense to negligence, but rather a factor to be considered. In order for reliance on professional advice to excuse a taxpayer from the additions to tax for negligence, the taxpayer must show that such professional had the expertise and knowledge of the pertinent facts to provide valuable and dependable advice on the subject matter. Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995).

Whether petitioner properly deducted the $400,000 involves a complex factual inquiry. When a guarantor of a corporate debt is a shareholder and also an employee, mixed motives for a guaranty may be present, and the critical issue becomes, in an objective sense, which motive is dominant. United States v. Generes, 405 U.S. at 100.

In addition, petitioner's accountant, who maintained adequate books and records for petitioner, agreed with his treatment of the losses. Petitioner, on his 1990 Federal income tax return, reported that he was deducting $400,000 in capital losses on his Schedule D. This stems from petitioner's cap loan. The record also reflects that on petitioner's 1990 Schedule C, he reported $400,000 in losses pursuant to "personal guarante [sic] of loan from corporation".

We hold petitioner was reasonable in his reliance on advisers and in his reporting position, and, accordingly, he is not liable for the accuracy-related penalty under section 6662(a) for the 1990 taxable year.

To reflect the foregoing and due to concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.